No. 2971.

## Willis Brown *v.* The State.

1. Practice—Confession.—The confession of an accused, made by him
   when under restraint, or that has been extorted from him by violence or
   persuasion, can not be used by the State in evidence against him. An
   exception to this rule is when, in connection with such confession, the
   accused makes a statement of facts which is subsequently found to be
   true, and which conduces to establish his guilt of the offense for which
   he is on trial. (Code Crim. Proc., art 750.) See this case in illustra-
   tion.

2. Same—Constitutional Law.—The exception above stated is not vio-
   lative of section 10 of article 1 of the Constitution of this State. That
   section of the Constitution could be interposed to protect an accused
   against compulsion to give evidence as a witness against himself.

Appeal from the District Court of Walker. Tried below be-
fore the Hon. N. G. Kittrell.

The conviction in this case was for burglary, and the penalty
assessed against the appellant was a term of eight years in the
penitentiary.

· J. B. Holland was the first witness for the State. He testified that he lived at Riverside, in Walker county, Texas, and was owner and proprietor of the store for the burglary of which the defendant was on trial. The witness returned from a camp hunt on a certain Tuesday in April, 1888, when Mr. Orville Wiley, whom he had left in charge of his store, informed him that the said store had been entered on the preceding (Monday) night. The witness then discovered that the burglar effected his entry into the house by climbing to the top of a pile of goods boxes on the outside, where he tore a paste board from a broken pane in a window, through which he thrust his hand and removed a stick which fastened the sash, and then he raised the sash and got in. Upon examination the witness discovered that his money drawer was broken into, and some money, including certain mutilated coins, had been stolen therefrom. He also missed his pistol. Mr. J. M. Parish got back from the camp hunt on the day after the witness did, and came to witness's store about dusk, which was the witness's usual hour for closing his store. Witness told Parish about the burglary of his store, whereupon Parish called the defendant, who was standing near, into the store, and told witness to close the door; which the witness did. Parish and the defendant discussed the burglary for some time, Parish finally charging the defendant with being a party to it. Defendant vigorously and repeatedly denied that he had any part or participation in the burglary, and finally disputed Parish's word about some matter in no way connected with the burglary. Parish thereupon seized a gun that was standing behind the counter, and threatened to knock defendant down with it, but did not strike him. Defendant still persisted that he was in no way connected with the burglary. Parish then told the witness to cut him off about seven feet of three-quarter inch rope, which the witness did, and handed it to him, not knowing what Parish intended to do with it. Parish then took the defendant to the rear of the store, gave him a drink of whisky and talked kindly to him about the breaking of the store. Defendant then said that he did not break into the store but that he knew who did, and that Charley Monroe was the person. Parish then sent for Monroe and he was brought to the store. He and defendant were then jointly charged with the burglary, but both denied that they had anything whatever to do with it. Parish then took Monroe to the woods out on the Huntsville road, and after

awhile somebody (witness did not remember who) took the defendant to the same place. Witness went to the woods soon afterwards, and when he reached the several parties he found the defendant weeping, and heard him say that he and Charley Monroe broke into the store. Defendant and Monroe then disputed some time as to which of them went into the store, and which remained on the outside. Defendant then said that he knew where the goods were and would go and get them. Monroe then remarked that the goods were hidden in the house where he and defendant spent the night of the burglary. Defendant, on the other hand, after Parish struck him a blow or two with the rope, said they were hidden in a thicket beyond the railroad. He and Monroe were then taken to the thicket indicated, and the defendant, after searching around in the dirt, unsuccessfully for awhile, produced the missing goods. Among other articles the witness identified the mutilated coins, his pistol and some coarse combs which still had his price mark on them. When these goods were unearthed by defendant, both defendant and Monroe said that they got them from the witness's store, and that they also got two pairs of pants and some calico, which Monroe took. Monroe and defendant said that they were in the store when the midnight train arrived, and that they were on the depot platform when Baker and Wiley left to go to Dodge.

Cross examined, the witness stated that, while in the store, before going to the woods, he heard Parish tell the defendant that he would knock him down if he disputed his word again. He also told defendant that he, defendant, knew who broke into the store, and that he must tell. Parish asked for the rope after the defendant denied repeatedly that he knew anything about the burglary. He did not say what he wanted with the rope, and, while witness did not know, he had an idea of the use that Parish proposed to put it to. If defendant was tied when he was taken to the woods, witness did not know it. Defendant was crying when witness reached the woods, but if he had been whipped the witness did not know it. Witness saw no blows struck until the one or two were inflicted upon the defendant after he told where the goods were secreted, and agreed to produce them. He was then whipped after the goods were produced. Neither defendant nor Monroe implicated any other person in the burglary. Monroe said that he hid the pants and the calico, but was violently drunk at the time, and

could not remember where he hid them. At the time of the said burglary, the witness was justice of the peace and post master.

J. M. Parish testified, for the State, that he got back to Riverside from a camp hunt a day or two after the burglary of Holland's store. Soon after he learned of the burglary, he "spotted" the defendant and Charley Monroe as the guilty parties, and, on the evening referred to by Mr. Holland in his testimony, called the defendant into Holland's store and had the front door closed. The witness had previously seen the defendant and Monroe behind Parker's store, where they held a protracted private conversation, and he learned that they had been spending money in town. When he got the defendant into the store he charged him with having had something to do with the burglary. He persistently and repeatedly denied that he had anything to do with it, concluding each of his denials with the statement, "Boss, I am giving you straight goods." The witness insisted that he did know, and about that time the defendant disputed the witness's word about a matter in 'no way connected with the burglary, when witness seized a gun and threatened to knock him down with it. Defendant then stated in a positive manner, that he knew nothing whatever about the burglary, and witness told Holland to give him a piece of rope. Holland handed him the rope, and the witness then led the defendant to the rear of the store, gave him a drink of whisky, and proceeded to talk kindly with him. Defendant then said that he did not break into the store, but that to his knowledge Charley Monroe did. Witness then sent for Charley Monroe, who was brought to the store and confronted with defendant. Witness could then get no information from either defendant or Monroe. Accordingly, he took Monroe to a point in the woods on the Huntsville road, and by way of inducement to talk, administered to him a few blows with the rope. That argument had its effect, and Monroe told him all about the matter. Defendant was brought to the woods soon afterward and admitted his complicity in the burglary. He and Monroe concurred in the statement that the goods were hidden, but disputed as to the hiding place. Witness then remarked that he did not propose to take a long walk for nothing, and, to get the truth, abandoned his policy of peaceable inducement to fall back upon the more persuasive logic of the rope's end. Two or three blows encouraged the defendant to propose the discovery

of the goods.  He then piloted the witness and his party to a point in a thicket beyond the railroad, where he produced several of the missing articles from a hole in the ground.  Defendant and Monroe then disputed as to which of them actually entered the house, each charging the other.  Monroe said that he hid the pants and calico, but was so drunk on whisky he got out of the store when he did it that he could not remember where he hid them.  Defendant and Monroe were then whipped for the purpose of making them disclose the hiding place of the pants and calico.  Defendant, who insisted that he did not know where Monroe hid the pants and calico, was made to whip Monroe, using the rope and a bell collar.  Witness then administered a few blows to Walker Johnson, another negro, whom he suspected of complicity in the burglary.  Defendant and Monroe said that they were on the depot platform when Baker and Wiley left to go to Dodge, and that they then broke into the store, and that they were in it when the midnight passenger train passed through town.

Cross-examined, the witness said that at first the defendant vehemently and repeatedly denied that he had anything to do with the burglary.  Witness did not tell Holland what he wanted with the rope, but his purpose in calling for and taking it was to whip out of defendant all that he was satisfied the defendant knew about the burglary. · He, however, did not strike defendant until the latter admitted his participation in the burglary and got to disputing with Monroe as to where the stolen articles were hidden.  He then whipped defendant to get at the truth—in short, to make him disclose the place where the articles were secreted.  He did threaten to knock the defendant down with the gun for disputing his word, but that was about another matter than the burglary, and had no connection whatever with the burglary.  The whippings were administered to the negroes with their pants down.  Witness was the foreman of the grand jury which was organized at the present term of the court.

Orville Wiley was the next witness for the State.  He testified that he was in the employ of Mr. Holland as a clerk in his store at Riverside, on the night that the said store was burglarized.  He left Riverside a little after dark on the said night to attend a party at Dodge.  He got back about two o'clock on the next morning, and, as soon as he entered the store, discovered that it had been burglarized during his absence.  He found the cloth-

ing scattered about the store, and the money drawer broken open and all the money that he left in it was gone. He left about fourteen dollars in the drawer, five of which was a United States currency bill, and the balance silver, including a peculiarly mutilated twenty-five cent piece. He then saw where the burglar or burglars entered at the window, under which a number of goods boxes were piled. The goods were in their usual places when the witness left the store on that night. He did not give his consent to defendant nor to any other person to enter the said store, nor to take any of the articles therein contained. Witness next saw the mutilated twenty-five cent piece above spoken of when the defendant dug it out of the ground with other articles, which he, witness, recognized as articles he left in the store. At that time he heard the defendant say that he and Monroe got the goods from Holland's store—that Monroe went into the store, and he watched on the outside. On his cross examination, the witness said that, as he started to Dodge on the night of the burglary, he saw two negroes on the platform at the depot, but did not recognize them. He saw the whipping of the defendant and Monroe and Walker Johnson, which was administered in the woods by Parish and others.

Walker Johnson testified, for the State, that at the time of the burglary he lived in the same house with the defendant and Charley Monroe. Defendant and Monroe left the house early on that night, and did not get back until some time after the midnight passenger train passed through Riverside. As they entered the house, one of them—witness did not know which— said: "I made my jack"—which in gaming parlance means "making a raise" or "getting a stake." The witness was whipped on that night, because, as he was informed, he was caught in bad company.

The defense offered no evidence.

*W. O. B. Gillaspie,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

Willson, Judge. It is clear that, at the time the defendant made the confession admitted in evidence against him, he was under restraint. It is also clear that he did not make said confession voluntarily, but that it was extorted from him by means of violence inflicted on his person ; but it further appears from

the evidence that, at the time of making said confession, he also made a statement of facts and circumstances which were found to be true, and which conduced to establish his guilt of the burglary charged against him. He stated where a portion of the stolen property was secreted, and this statement was found to be true, and by means thereof said property was discovered.

Under article 750, of the Code of Criminal Procedure, as construed by the Supreme Court and by this court, such corroboration of a confession renders the confession admissible in evidence against the defendant although it may have been obtained by compulsion or persuasion. (Warren v. The State, 29 Texas, 370; Selvidge v. The State, 30 Texas, 60; Strait v. The State, 43 Texas, 486; Weller v. The State, 16 Texas Ct. App., 200.) Such being the law, the court did not err in admitting the confession of the defendant in evidence against him. Nor do we perceive any error in the charge of the court relating to the subject of the confession.

It is contended by counsel for the defendant that this construction of article 750 of the Code of Criminal Procedure makes said article violative of section 10, article 1 of the Constitution of this State, in that it would compel a defendant to give evidence against himself. We do not understand this constitutional provision to be applicable to the case. If it had been sought to compel the defendant, as a witness, upon the trial of his cause, to give evidence against himself, said provision would protect him; but it can not be reasonably held, we think, that said provision extends its protection to the defendant so as to render inadmissible against him his involuntary declarations or acts, which would otherwise be admissible.

We find no error in the conviction, and the judgment is affirmed.

*Affirmed.*

Opinion delivered October 31, 1888,