# APRIL 6, 1938

CHARLIE BROOKS V. THE STATE.

No. 19532. Delivered April 6, 1938.

The opinion states the case.

*K. J. Bragdon,* of Jefferson, and *B. F. Whitworth,* of Linden, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, death.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Alex Brown by shooting him with a shotgun.

Deceased was the sheriff of Marion County. Appellant, who is a negro, had been incarcerated in the jail. After he and a companion had escaped from the jail deceased had made an effort to recapture them. The homicide occurred on the night of the 9th of March, 1937, as deceased was preparing to go to bed in his quarters in jail. The wife of the deceased testified that deceased was standing with his back to the window when some one outside shot him. Appellant made a confession, which, omitting the formal parts, reads as follows:

"My name is Charlie Brooks. I live in Jefferson, Marion County, Texas. I have lived in Jefferson all my life. I was born there. On December 9, 1936, I was accused of stealing $1.40 from some girl over at Mabel Young's Beer Parlor and was arrested by Sheriff Alex Brown that same night and placed in jail there in Jefferson, Texas. I stayed in jail until J. C. Hartfield and I broke out of the jail on March 5, 1937, which was on Friday night. After I got out of jail that night I went on down to Foggy Bottom to Abe Cooper's place, and met Fox McCoy just before I got to Cooper's place. Me and Fox drank some whisky together and then we went on down to Abe's Beer Parlor and talked to Abe, and Abe told me that Sheriff Brown

was looking for me and J. C. Hartfield, and was going to kill us when he found us. After he told me this I got a girl, Georgia Florence, to go on with me to Charlie Johnson's house, and we stayed there just a few minutes and then me and Fox left and went to McIntosh Barbecue Pit and got some barbecue to eat and went on over to the T. P. crossing and met B. Locket and we stood around there about fifteen minutes eating the barbecue. Then I went on up to Allen Riley's house and stayed in Allen's house Friday night, Saturday and Sunday and Monday and stayed there Tuesday until about 5 o'clock in the afternoon. When I left Allen's house on Tuesday night, March 9, I took a double barrel shotgun which belonged to Allen with me. I went on through the woods there close to Allen's house and took a shot at a rabbit and then went on over to Ina Whaley's house. I still had the shotgun with me at Ina's house, and I asked her if she had any shells in the house there, and she said that she did not have any. I told Ina that the sheriff had his eyes on me and that I had mine on him. I left then and went on down to Abe Cooper's and I carried the shotgun with me and on the way up to Abe's house I went to Tom Kennedy's house and got one shell from him. I had already gotten two shells from George Cooper. One of the shells I got from George I couldn't tell what it was but one of them was a buckshot shell. After I got to Abe's place I shot the gun around in the back of Abe's Beer Garden. I was drinking pretty much and I just wanted to see if the gun would shoot all right. I walked on around to the front of Abe's place and Abe told me that I ought not to be shooting that gun around here that the law would be after me. I said Yes I know that he is looking for me and I am looking for him too. I then cut through to the T. P. spur and then went on up the track to the ice house. This was somewhere around midnight. I stayed there at the ice house about three or four minutes watching over at the jail to see when Mr. Brown came in. It was not long until I saw Mr. Brown drive up in his car and I saw him go into the jail, then I walked on up in front of the jail and I saw the sheriff inside of the jail and saw him take off his pistol and his shirt. I saw Mrs. Brown inside walking around. I stood there and watched him and was waiting for Mrs. Brown to get out of the way; she was between me and the sheriff. In a few minutes the sheriff turned around as though he was going to sit down over near the window that I was looking in and just as he started to sit down I shot him with the shotgun that I had. I knew that I had hit the sheriff because I was only twenty-five or thirty feet from him and I had the gun aimed right on him. Just as soon as I shot

him I started running up a little street west which runs behind the Schluter Hotel. I unbreeched my gun as I ran along and I think, I wouldn't be sure, but that I unbreeched my gun and threw the shell out just about back of the Schluter Hotel. I ran about two and one-half blocks and then I started to walking, and walked on up to Speed's Hall, and then went on out to the T. P. crossing and went back down the T. P. Railroad and then cut across to Welch's Bridge, this bridge is on the road that goes from Jefferson to Harlton. I threw the gun off the bridge on the left hand side of the bridge into the Big Cypress River. I was about ten or twelve feet from the end of the bridge when I threw the gun into the water. I mean the end of the bridge on the Jefferson side. I heard the gun when it hit into the water. Since that night, I have been on the dodge staying at first one place and then another. I stayed with my uncle a couple of nights, and I stayed Saturday and Sunday nights with Bubba Rice and then I came on up to John Douglas' house, which is about four or five miles out on the Jefferson-Smithville road from the town of Jefferson. I was there yesterday when the officers came up to the house, and as soon as I saw them I ran out the back of the house. I heard the officers holler at me to stop. I didn't stop and they commenced shooting at me and I was hit in both legs. Then I fell. I ran because I was scared and I knew why they had come after me. Then the men who came after me arrested me and took me to the doctor's office and got me treated for the shots that I got in my leg, then they took me on to the jail and put me in the jail. Then the rangers came and got me and brought me to the jail in Henderson, Texas. I have read this entire statement over and everything in it is true and there is nothing more that I care to say about it and nothing in this statement that I care to withdraw."

After his arrest appellant told the officers that the shotgun he had used in killing the deceased was in the river. Pursuant to this statement, the gun was discovered at the place indicated by the appellant.

Appellant took the witness stand and denied that he had killed the deceased. It was his version that the officers had used third degree methods in obtaining the confession. The testimony of the officers was a denial that appellant had been mistreated by them. According to their version, the confession was voluntary.

Appellant made a motion to continue or postpone the case on the ground that his counsel had not had sufficient time to prepare for trial. It appears that one of counsel for appellant had been appointed nine days before the case was called for

trial, and four days before the trial a second attorney was appointed. It is averred in the motion that appellant believed that if given sufficient time to make an investigation and determine the facts he would have a good defense and could show that he was not guilty. There is nothing in the application to indicate what witnesses appellant could have secured and what defense he expected to interpose. Under the circumstances, the trial court was warranted in denying the application.

The bill of exception relating to appellant's objection to the introduction in evidence of his confession merely states grounds of objection. Nowhere in said bill are the objections supported by the evidence adduced before the court at the time the confession was offered. The bill is insufficient. However, if the statement of facts should be consulted, it appears that appellant's contention that the confession was obtained through coercion was controverted by the testimony of the officers. Under the circumstances, it was for the jury to determine whether such confession was voluntary. This issue was adequately submitted in the charge of the court. It might be added that, pursuant to the confession, the shotgun appellant was alleged to have used in killing the deceased was found in the river where appellant told the officers he had thrown it. Article 727, C. C. P., reads as follows:

"The confession shall not be used if, at the time it was made, the defendant was in jail or other place of confinement, nor while he is in the custody of an officer, unless made in the voluntary statement of accused, taken before an examining court in accordance with law, or be made in writing and signed by him; which written statement shall show that he has been warned by the person to whom the same is made: First, that he does not have to make any statement at all. Second, that any statement made may be used in evidence against him on his trial for the offense concerning which the confession is therein made; or, unless in connection with said confession, he makes statements of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed. If the defendant is unable to write his name, and signs the statement by making his mark, such statement shall not be admitted in evidence, unless it be witnessed by some person other than a peace officer, who shall sign the same as a witness."

We quote from 18 Tex. Jur. 179, as follows: "Regardless of whether the accused was under arrest or had been warned, his

verbal or written confession is admissible where the facts and circumstances stated have been found to be true and conduce to establish his guilt. Such facts and circumstances may consist of finding of secreted or stolen property or the instrument with which the crime was committed, or of the discovery or identity of the remains, clothing, jewelry or personal effects of the person whom the accused is charged of having murdered. This is true even though the confession was involuntary or was procured by force, threats or intimidation, persuasion, assurance of protection against mob violence or deception."

In support of the text many authorities are cited, among them being Washington v. State, 216 S. W. 869; Brown v. State, 9 S. W. 613; Ferguson v. State, 40 S. W. (2d) 107; Singleton v. State, 221 S. W. 610.

Appellant brings forward several bills of exception in which he complains of the argument of counsel for the State. Each of these bills is qualified by the trial judge to show that no objection was interposed at the time the arguments were made, and that the court's attention was not called to the matter until after the jury had retired to deliberate. Further, the qualification states that the court offered to recall the jury and instruct them not to consider said arguments. In Scott v. State, 105 S. W. (2d) 242, this Court held that an argument not objected to at the time it was made could not be reviewed on appeal.

The subject dealt with in appellant's requested charge No. 2, which was refused by the court, appears to have been covered in the main charge and in special instructions which were given at the request of the appellant.

We have discussed the questions briefed by the appellant, and have carefully examined all matters presented by the record. The opinion is expressed that reversible error is not presented.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.